UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
K.D. HERCULES, INC. et al.,                                 :
                                                            :
                                     Plaintiffs,            :      20 Civ. 4829 (LGS)
                                                            :
              -against-                                     :      **OPINION AND ORDER**
                                                            :
LABORERS LOCAL 78 OF THE LABORER'S                          :
INTERNATIONAL UNION OF NORTH                                :
AMERICA et al.,                                             :
                                                            :
                                     Defendants.            :
------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

   Plaintiffs K.D. Hercules, Inc. ("Hercules"), K.D. Hercules Group, Inc. ("Group") and Kyriakos Diakou bring this action against Laborers Local 78 of the Laborers' International Union of North America ("Local 78") and Mason Tenders' District Council of New York ("MTDC").  Plaintiffs allege that from June 2019 to October 2019, Defendants engaged in unlawful secondary activity by picketing a construction site where Hercules was contracted to work, in violation of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 187 ("Section 303"), and Section 8(b)(4) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(4), (e).  Plaintiffs also assert various tort claims sounding in defamation under New York state law.  Defendants move for summary judgment on all claims.  For the reasons stated below, Defendants' motion for summary judgment is **GRANTED**.

I.   BACKGROUND

The background facts below are drawn from the parties' Rule 56.1 statements and other submissions. These facts are either undisputed[1] or based on evidence in the record, drawing all reasonable inferences in favor of Plaintiffs as the non-moving parties.

In this action, Plaintiff Diakou claims that Defendants caused him and his two companies, Plaintiffs Hercules and Group, to lose a job performing asbestos abatement work for Riverbay Corporation ("Riverbay"), the company that manages the Co-op City apartment complex in the Bronx. Plaintiffs claim that Defendants, which are labor unions, caused Plaintiffs to lose the job by mounting a protest at Co-op City, during which union representatives erected large rat-shaped balloons and distributed a handbill to passers-by criticizing Hercules as unsafe and substandard. Plaintiffs also point to a complaint made by Local 78 representatives to Riverbay about Hercules' safety record. Defendants contend that Riverbay terminated the asbestos abatement contract with Plaintiffs because Plaintiffs changed course and determined that they would be "working non-union" even though Riverbay previously had decided to use union labor on the job and contracted with Plaintiffs to do so. The central factual issue in this case is why Riverbay terminated its contract with Hercules. The question on this motion is whether the record provides sufficient evidence for a reasonable jury to credit Plaintiffs' account

---

[1] Numerous facts in Defendants' Local Rule 56.1 statement are deemed undisputed, either because Plaintiffs did not contravene the alleged fact or because Plaintiffs provided no record citation to support their contrary assertion. Plaintiffs' statement of facts in their Opposition similarly contains no record citations and appears to be copied and pasted from portions of the Second Amended Complaint. Each factual assertion in a 56.1 statement is deemed admitted unless specifically controverted, and any factual statement by a movant or opponent must be followed by a citation to admissible evidence. *Joint Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York 56.1.*

and conclude that Defendants' conduct was a substantial factor in causing Plaintiffs to lose the Riverbay job.

      A.      **Hercules Contract #3059 with Riverbay**

In 2017, Hercules entered into a contract with Riverbay -- Contract #3059 -- to perform asbestos abatement work at Co-op City in the Bronx. In bidding for Contract #3059, Plaintiffs submitted a bid with "union" prices. Contract #3059, executed by Diakou and Riverbay, stated that it is "based on UNION unit pricing." On or about April 11, 2019, Diakou and Hercules notified Local 78 and MTDC that effective June 30, 2019, they were terminating the Collective Bargaining Agreement ("CBA") with Local 78, which required that employers such as Hercules pay their union member employees certain hourly wages. Diakou informed the employees on the Riverbay asbestos abatement project that from June 30, 2019, if they decided to stay on the job, they would be working "non-union." Diakou also informed Riverbay that he would continue his work as a non-union shop. After June 30, 2019, Plaintiffs operated the asbestos abatement at Co-op City "non-union."

In or about May 2019, Riverbay officials informed Diakou that Contract #3059 was void because he had bid union prices but was now opting out of the union, and that the contract would be re-bid. Riverbay's Safety Director explained in a July 18, 2019 memorandum that "because K.D. Hercules was no longer a union shop his contract was null and void." Riverbay's Director of Restorations testified that Riverbay had to terminate the contract because the contract required the work to be performed union. In a May 23, 2019 email, a Riverbay official explained to Diakou that by not providing "union operations," Diakou "would be in default of the contract and subject to termination."

The asbestos abatement job was re-bid as Contract #3394, and Group submitted a bid with non-union prices. Diakou told Riverbay that he could not afford union labor. A Riverbay official explained to Diakou that "we need to move forward with the asbestos contract with a union contractor." In late August 2019, Riverbay decided to award Contract #3394 to Abatement Unlimited, which had bid union rates.

Riverbay continued its business relationship with Plaintiffs after terminating the asbestos abatement contract. Diakou confirmed at his deposition that he continued to do work for Riverbay after August 2019. In January 2021, long after the events of 2019, Riverbay terminated two other contracts with Plaintiffs.

> **B.   Union and Plaintiffs' Relations: Unpaid Contributions, Safety Concerns and Protests**

Plaintiffs argue that Defendants caused Riverbay to terminate the #3059 contract with Plaintiffs and rebid the replacement contract as a union shop contract in retaliation for Hercules' failure to make employee benefit contributions, as required by the CBA. Plaintiffs further argue that Defendants used protests and fabricated safety concerns to pressure Riverbay to terminate the Hercules contract.

The CBA between Plaintiffs and Defendants required Hercules to make contributions to employee benefit funds ("Funds") for employees' pension and health care benefits. In March 2018, when it was still operating under the CBA, Hercules entered into a settlement agreement with the Funds over delinquent contributions it owed. In the fall of 2018, Hercules failed to make payments under the settlement agreement, which required Hercules to stay current on its contributions and make monthly payments for past contributions. On November 3, 2020, the Funds obtained a consent judgment against Plaintiffs regarding unpaid contributions.

4

By February 2019, Riverbay had become aware of alleged safety violations by Hercules at Co-Op City. A union shop steward who was working on the Hercules asbestos abatement job reported safety violations first to Diakou and then to Local 78 and Riverbay. Riverbay's Safety Director memorialized the shop steward's formal complaint received on February 11, 2019, which included "pictures which showed a pile of wood tiles with limited containment . . . plastic only half way of [sic] the wall . . . [and] workers of K.D. Hercules, Inc. with no PPE protection." Defendants submitted the shop steward's declaration attesting to the veracity of the photos and her safety complaints. Although Diakou submitted a declaration disputing the veracity of the photos and contending that the shop steward fabricated safety violations, he did not have personal knowledge; when informed of the safety infractions he responded that he wanted to investigate and find out the facts. The Safety Director met with Diakou on February 15, 2019, and "explained that effective immediately all asbestos abatement must conform to New York City and OSHA Regulations." In an April 22, 2019 memorandum, the Safety Director wrote that he entered an apartment a few days earlier and observed Hercules employees performing asbestos abatement "with no protection, no air monitoring and improper PPE," and that "K.D. Hercules will be advised that this is his last chance. Another incident and his company will be removed from all projects at Riverbay." On July 18, 2019, the Safety Director learned that a decontamination unit at the Hercules jobsite was not operational, and again instructed Genesis and Hercules that they must conform to safety regulations for asbestos abatement, and that no abatement work was to continue until the decontamination unit was fully operational.

On various dates between July and September 2019, Local 78 protested Hercules's labor practices by erecting large, rat-shaped balloons at certain locations at Co-Op City. Local 78 organizers were stationed near the rat balloons and offered a handbill to pedestrians. The

handbill stated that Riverbay "[k]eeps hiring KD Hercules Inc. [a] substandard and unsafe contractor to perform deadly Asbestos abatement," and contained the following three questions: (1) "Do you really want to save money on Asbestos removal work by hiring substandard contractors?" (2) "Should immigrant workers be exploited just to save money?" and (3) "Should a community be exposed to this kind of danger just to save money?"  The handbill directed the reader to contact Riverbay's Restoration Director to "tell him [t]o hire only responsible contractors for hazardous work."

## II.   STANDARD

Summary judgment is appropriate where the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  There is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Johnson v. Jones*, 515 U.S. 304, 314 (1995); *accord Choi v. Tower Research Capital LLC*, 2 F.4th 10, 16 (2d Cir. 2021).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Saleem v. Corp. Transp. Grp.*, 854 F.3d 131, 148 (2d Cir. 2017).

In evaluating a motion for summary judgment, a court must "construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Torcivia v. Suffolk Cty., NY*, 17 F.4th 342, 354 (2d Cir. 2021).  When the movant properly supports its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by citing particular parts of materials in the record. Fed. R. Civ. P. 56(c)(1)(A). "A party opposing summary judgment normally does not show the existence of a

6

genuine issue of fact to be tried merely by making assertions that are based on speculation or are conclusory." *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021).

### III.    DISCUSSION

#### A.    LMRA Claim

Drawing all reasonable inferences in favor of Plaintiffs, no reasonable jury could find Defendants liable under § 303 of the LMRA. Section 303 makes it unlawful for "any labor organization to engage in any activity or conduct defined as an unfair labor practice" in section 8(b)(4) of the Act. 29 U.S.C. § 187(a). Section 8(b)(4)(ii)(B) states that it is an unfair labor practice for a labor organization to use threats, coercion, or restraint for the purpose of "forcing or requiring any person . . . to cease doing business with any other person . . . ." 29 U.S.C. § 158(b)(4)(ii)(B). This provision "is commonly referred to as the [LMRA's] 'secondary boycott' provision, which prohibits any labor organization from 'picketing against an employer with whom it does not have a dispute, with an object of forcing that secondary employer to cease doing business with a primary employer.'" *Hudson Yards Constr. LLC v. Bldg. & Constr. Trades Council of Greater N.Y.*, No. 18 Civ. 2376, 2019 WL 233609, at *4 (S.D.N.Y. Jan. 15, 2019) (quoting *NLRB v. Loc. 3, Int'l Bhd. of Elec. Workers*, 471 F.3d 399, 402 (2d Cir. 2006)).

An LMRA claim based on unlawful § 8(b)(4)(ii)(B) conduct has three elements -- first, that the union threatened, coerced or restrained a person; second, that the union's objective was to force or require the secondary employer to cease doing business with the primary employer, *see* 29 U.S.C. § 158(b)(4)(ii)(B); and third, that the unlawful conduct was the proximate cause of the damage. *Tru-Art Sign Co., Inc. v. Loc. 137 Sheet Metal Workers Int'l Ass'n*, 573 F. App'x 66, 67 (2d Cir. 2014) (summary order) (citing for each element respectively *Carrier Air Condition Co.* v. NLRB, 547 F.2d 1178, 1189-91 (2d Cir. 1976); *Nat'l Woodwork Mfrs. Ass'n v.*

7

*NLRB*, 386 U.S. 612, 644 (1967); *Landstrom v. Chauffeurs, Teamsters, Warehousemen & Helpers Loc. Union No. 65,* 476 F.2d 1189, 1195 (2d Cir. 1973)).  In this context, proximate cause means the unlawful conduct was a "substantial factor" or "material cause" in bringing about the plaintiff's injury.  *Omni Elevator Corp. v. Int'l Union of Elevator Constructors,* No. 19 Civ. 6778, 2022 WL 23224, at *10 (W.D.N.Y. Jan. 3, 2022) (internal quotation marks omitted); *BD Dev., LLC v. Loc. 79, Laborers Int'l Union of N. Am.*, No. 14 Civ. 4876, 2018 WL 1385891, at *25 (E.D.N.Y. Mar. 19, 2018).

    1.  <u>Causation</u>

   Even assuming that Plaintiffs could establish the first two elements, summary judgment is granted on the LMRA claim because of the lack of evidence to support Plaintiffs' theory of causation.  Based on the record evidence, no reasonable jury could find that Riverbay ceased doing business with Plaintiffs because of safety complaints or protests by Defendants.

   The record evidence supports only one explanation of why Riverbay terminated the Hercules asbestos abatement contract.  Undisputed evidence shows that Riverbay wanted union labor on the asbestos abatement job; contracted with Plaintiffs in 2017 to provide union labor; and then after two years, Plaintiffs decided for financial reasons to work "non-union."  Riverbay then terminated the contract, rebid the contract and hired a contractor that bid union prices.  At least three Riverbay officials either stated contemporaneously or testified under oath in substance that Riverbay terminated the contract because Plaintiffs were no longer providing union work as the contract required.  Although Plaintiffs dispute Riverbay's interpretation of the contract, they do not dispute that these statements were made.

   There is no evidence that Riverbay was substantially influenced to terminate the contract by the Union's protests and safety complaints.  First, as to the protests, they occurred after the

termination of the contract and thus cannot have influenced Riverbay's termination decision. The protests began in July 2019, roughly three months after Riverbay terminated the Hercules contract.

Second, as to the safety complaints, Riverbay threatened to terminate Hercules in April 2019, if there was another safety incident.  But there is no evidence that this apparent effort to get Plaintiffs to comply with safety requirements actually resulted in termination.  Plaintiffs merely speculate that Local 78's safety complaints contributed to the termination.  Plaintiffs state in their memorandum of law that "Riverbay terminated the contract because it was pressured by the Union."  To support this statement, Defendants cite two pieces of evidence – the "Diakou Declaration [and] Sipsas Declaration, Exhibit 6."[2]  The Diakou Declaration contains only conclusory speculation about the reason for the termination unsupported by facts.  It states regarding the contract termination, "When I sent a notice of terminating my CBA, then the Union started in a more aggressive way to destroy me and kick me out of the Co-Op city contracts.  They finally achieved their [goal] by lying, intimidating Riverbay and malicious[ly] defam[ing] me and Hercules by distributing the flyers which was all lies."  Plaintiffs present no evidence that Riverbay terminated the Hercules contract *because of* the union's conduct. Plaintiffs' other cited evidence, Exhibit 6 to the Sipsas Declaration, is the contract between Plaintiffs and Riverbay.  It provides no direct evidence of why Riverbay terminated the contract, and if anything, supports Defendants' conclusion that Riverbay terminated the contract because Plaintiffs no longer adhered to its terms.  The contract expressly states that it is based on union

---

[2] The Sipsas Declaration does not describe its exhibits, nor does it attest that they are true and correct copies, but merely says they are "as described in the Opposition to Defend[an]t's undisputed facts statement, in opposition to Defendants' motion for summary judgment."  A search of Plaintiff's response to Defendant's 56.1 statement and examination of Exhibit 6 reveals that Exhibit 6 is contract # 3059, the contract between Plaintiffs and Riverbay.

pricing. The document includes Rivebay's acceptance of Hercules' bid "for the not to exceed cost of $8,000,000 based on UNION unit pricing over a 3 year period." The attached Hercules proposal specifies "*UNION PRICING*" in price per square foot for 12 items and strikes out the same items listed under the heading "*NON-UNION PRICING*" and is signed by Diakou. Although Plaintiffs dispute Riverbay's interpretation of the contract, that issue is immaterial. The critical evidence, in the form of contemporaneous or sworn statements by Riverbay officials, is that Riverbay understood the contract to require a union shop -- i.e. hiring union labor at union wages -- and terminated the contract because Plaintiffs decided no longer to do so.

Nor is there any evidence that Defendants' conduct prompted Riverbay to award the replacement contract to another contractor other than Plaintiffs. Since Riverbay was seeking to replace Plaintiffs on the asbestos contract because Plaintiffs were no longer doing union work, it stands to reason that the replacement contractor would be a company that was quoting union prices to do union work. Plaintiffs did not controvert Defendants' assertion in the 56.1 statement that Plaintiffs bid non-union prices on the replacement contract. Plaintiffs merely responded that they bid "market prices." It should also be noted that Riverbay did not terminate two other contracts with Hercules, for "Turnkey Apartment Renovations" and "Installation of Wood Floors and Vinyl Composite Tiles" until January 2021, which occurred long after Defendants' protests and safety complaints in 2019.

        2.        <u>Other Provisions of LMRA § 8</u>

The Court construes the Second Amended Complaint ("SAC") to allege a violation of § 8(b)(4)(ii)(B). The SAC does not state which sub-section of § 8(b)(4) is relied upon -- i.e. which

statutory unfair labor practice is alleged.[3]  Section 8(b)(4)(i) appears to be inapplicable.  It pertains to a labor union encouraging employees to strike.  The SAC alleges in paragraph 18 that Local 78 threatened Diakou that the union would withdraw its members from Plaintiffs' job sites due to Plaintiffs' failure to make benefit contributions.  Plaintiffs' opposition to the instant motion makes a similar assertion.  But the SAC contains no allegation, and Plaintiffs have not identified any record evidence, that the union actually induced or encouraged anyone to strike at Plaintiffs' job sites and thereby caused injury to Plaintiffs.  Also, the provision by its terms does not apply to strikes against Plaintiffs; it is aimed instead at so-called secondary activity, for example strikes against Riverbay to induce Riverbay not to deal with Hercules.  *See* 29 U.S.C. 158(b)(4)(B); *Colacino v. Davis*, No. 19 Civ. 9648, 2020 WL 3959209, at *4 (S.D.N.Y. July 13, 2020) (describing the unfair labor practices set forth in Section 8(b)(4) as secondary boycott activity); *All-City Metal, Inc. v. Sheet Metal Workers' Int'l Ass'n Loc. Union 28*, No. 18 Civ. 958, 2020 WL 1502049, at *5 (E.D.N.Y. Feb. 18, 2020) (describing Section 8(b)(4) as the "secondary boycott provision").

Sections 8(b)(4)(i)(A), (C) and (D) are also inapplicable, and neither the SAC nor Plaintiffs' responsive motion papers suggest otherwise.  The SAC also references a violation of § 8(e), but neither the SAC nor Plaintiffs' opposition to summary judgment alleges or argues that Riverbay and Defendants entered into any agreement prohibited by that provision.

---

[3] Plaintiffs' reference to "§ 8(b)(4)(D)" in their memorandum of law in opposition to the motion appears to be a typographical error as § 8(b)(4)(ii)(D) defines as an unfair labor practice a union's "forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class . . . ."

### B. Tort Claims

Plaintiffs' tort claims are barred under the New York Court of Appeals decision in *Martin v. Curran*, 101 N.E.2d 683 (N.Y. 1951). In that decision, the court held that "because a labor union is a voluntary unincorporated association, the plaintiff was required to plead and prove that each member of the union authorized or ratified the alleged wrongful conduct." *Palladino v. CNY Centro, Inc.*, 12 N.E.3d 436, 441-42 (N.Y. 2014) (declining to overrule the *Martin* rule). Contrary to Plaintiffs' claims, the *Martin* rule applies to claims brought under New York law in federal court. *See Modeste v. Loc. 1199, Drug, Hosp. and Health Care Emps. Union, RWDSU, AFL-CIO*, 38 F.3d 626, 627 (2d Cir. 1994) (affirming district court's dismissal pursuant to the *Martin* rule); *see, e.g.*, *Leonel Cruz v. United Auto. Workers Union Loc. 2300*, No. 3-18 Civ. 0048, 2019 WL 3239843, at *19 (N.D.N.Y. July 18, 2019) (dismissing state law claims against the union defendants, applying the *Martin* rule); *Sullivan v. N. Babylon Union Free Sch. Dist.*, No. 15 Civ. 834, 2016 WL 11673810, at *7-*9 (E.D.N.Y. Mar. 21, 2016) (dismissing a state law claim against a union of breach of duty of fair representation applying the *Martin* rule). The *Jund* case relied on by Plaintiffs is distinguishable because the court declined to apply the *Martin* rule to federal causes of action. *See Jund v. Hempstead*, 941 F.2d 1271, 1279 (2d Cir. 1991); *Sullivan*, 2016 WL 11673810, at *7-*8 (distinguishing *Jund* on the same ground).

Here, the evidence provides no basis for a reasonable jury to conclude that every member of Local 78 and MTDC ratified Local 78's protests or safety complaints. Plaintiffs assert in their opposition to Defendants' Rule 56.1 statement that "Local 78 ratified any of their actions using their meetings," but Plaintiffs cite no evidence to support this statement. Accordingly, the tort claims are dismissed under the *Martin* rule.

IV.     **CONCLUSION**

For the reasons stated above, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to close the motion at Docket No. 64 and close the case.

Dated: January 24, 2022
       New York, New York

_____
LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE